IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF ONE IPHONE, BLUE IN COLOR, DESCRIBED MORE FULLY IN ATTACHMENT A. | Case No. 3:23-SW-<span>77</span><br><br>**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, James R. Albright, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an Application under Rule 41 of the Federal

Rules of Criminal Procedure for a search warrant authorizing the examination of property—one

iPhone, blue in color, having two rear facing cameras, one rear-facing flash, and one rear-facing

microphone held within a multi-colored case with a key-ring and a graphic of a bear (labeled

"DARKBEAR") (the "Target Device"), more fully described in Attachment A—which is

currently located at the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) Richmond

Group III office located at 600 East Main Street, Suite 1401, Richmond, Virginia, 23219—and

the extraction from that property of electronically stored information, described in Attachment B,

which is incorporated by reference

2.      I have been an ATF Special Agent since November 2021. As an ATF Special

Agent, I am authorized to investigate violations of the laws of the United States and am currently

engaged in numerous criminal investigations involving violations of federal law. I am a law

enforcement officer with authority to execute arrest and search warrants under the authority of

the United States. *See* 18 U.S.C. § 3051. I completed the Criminal Investigator Training Program and ATF Special Agent Basic Training at the Federal Law Enforcement Training Center in Glynco, Georgia, which included instruction on investigating federal crimes involving firearms, narcotics, arson, and explosives. I am currently assigned to the ATF-Washington Field Division, Richmond Group III.

3.      Prior to my tenure as an ATF Special Agent, I was a duly sworn Officer of the Metropolitan Police Department (MPD), District of Columbia and was so employed from May 2012 through April 2021. While serving at MPD, I was assigned to the Narcotics Special Investigative Division's Narcotics Enforcement Unit (NEU) and was a member of a specialized unit known as the Crime Suppression Team (CST), where I was responsible for investigations involving unlawful activities to include gangs/criminal enterprises, narcotics trafficking, firearm offenses, and violent crimes. I was principally involved in narcotics and narcotics-related investigations, including narcotics investigations related to violent offenses, often involving the criminal use of firearms. Since 2012, I have received training and experience in interviewing and interrogation techniques, arrest procedures, search and seizure, search warrant applications, and narcotics and various other crimes. From my training and experience, I have become familiar with the methods and techniques utilized by firearms traffickers, prohibited persons in possession of firearms, illegal drug traffickers and drug trafficking organizations ("DTOs").

4.      As a part of firearms investigations, I have interviewed informants and cooperating witnesses, including federally prohibited persons who have possessed firearms; conducted physical surveillance; conducted consensual monitoring and recording of telephonic and non-telephonic communications; and obtained and executed search warrants that have led to seizures of narcotics, firearms, and other contraband. Based on my training, knowledge, and

2

experience, I know that firearms and narcotics traffickers utilize mobile devices to maintain contact with their customers, suppliers and associates; maintain contact lists and communication applications ("apps"); plan and maintain information related to travel; access and store financial information and conduct banking activities; maintain calendars and reminders; and take and store pictures of themselves, their associates, money, firearms and other indicia of illegal activities. Based upon these investigations, I also know that individuals often use internet commerce to purchase firearms and firearms related devices, to include machine gun conversion devices (commonly referred to as a "Glock Switch" or "Switch").

5.    The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, law enforcement officials and/or witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

## PURPOSE OF AFFIDAVIT

6.    Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 18 U.S.C § 922(g)(1) (possession of a firearm by a convicted felon) and Title 18 U.S.C § 922(o) (illegal possession of a machine gun) have been committed by Perry Ike MASON (B/M, DOB: 06/XX/1995) and that a search of the Target Device, described in Attachment A, may contain evidence of these crimes, as described in Attachment B.

7.    The Target Device is currently in the lawful possession of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) Richmond III office, located at 600 East Main Street, Suite 1401, Richmond, Virginia, 23219. The Target Device was seized following the arrest of MASON on April 7, 2023. I know that the Target Device has been stored in a manner in which

3

its contents are, to the extent material to this investigation, in substantially the same state as they were when the Target Device first came into the possession of ATF.

## PROBABLE CAUSE

8.     The United States, including ATF Richmond III, is conducting a criminal investigation of Perry Ike MASON regarding possible violations of Title 18 U.S.C § 922(g)(1) (possession of a firearm by a convicted felon) and Title 18 U.S.C § 922(o) (illegal possession of a machine gun).

9.     MASON has the following felony convictions:

   a.  November 13, 2020: guilty; possession with intent to manufacture/sell controlled substances – Schedule I/II (Richmond City, VA); and

   b.  November 13, 2020: guilty; display of a firearm while selling Schedule I/II drugs (Richmond City, VA).

10.     On April 7th, 2023, Richmond Police Department (RPD) detectives with the Strategic Violence Interdiction Unit (SVIU) received information that a known and wanted felon, Perry Ike MASON, was in possession of a semi-automatic handgun which appeared to be altered with a machine gun conversion device (commonly referred to as a "Glock switch" or "switch"). A machine gun conversion device alters a semi-automatic firearm to be capable of firing fully automatic; meaning multiple rounds are expelled by a single trigger pull.

11.     This information came in the form of an Instagram Live video[1] posted by MASON under the Instagram account "fucklovditsnotreal," which SVIU detectives know to be

---

[1] Instagram Live allows a user to stream a video in real-time. Other users may join the livestream.

associated with MASON. During the Live, which began streaming at approximately 1:26 PM on April 7, 2023, MASON could be seen entering a vehicle and then removing a Glock-style firearm from his jacket. The firearm featured what appeared to be a machine gun conversion device, a weapon-mounted laser with a yellow sticker, and an extended magazine. At one point, MASON wore a black balaclava. Detectives identified MASON's location in the video as the Speed Mart on 2700 Broad Rock Boulevard in Richmond, VA, based on the signage seen on the Live. Detectives began to investigate and continued to view MASON's Live videos.

12.     At approximately 5:51 PM on April 7, 2023, on Live, MASON brandished what appeared to be the same firearm from earlier in the Live. At one point, MASON picked up the firearm and held it to his head. When MASON did this, the machine gun conversion device on the rear plate was visible.

13.     At approximately 6:25 PM on April 7, 2023, detectives responded to the Speed Mart at 2700 Broad Rock Boulevard and reviewed security footage from approximately 1:24 PM that same day.  The security footage showed MASON in the Speed Mart and then entering a light-colored Nissan at approximately 1:26 PM. This is the approximate time that MASON entered the vehicle in the Live video. In the security video, MASON can also be seen putting on the black balaclava that he was wearing at approximately the same time in the Live.

14.     At approximately 7:42 PM on April 7, 2023, the Live showed MASON at what appeared to be a restaurant. The Live showed placemats, plates, and a napkin holder marked "Twisted Crab," along with MASON. Shortly thereafter, detectives responded to the Chesterfield Towne Center in Richmond, VA, which is where the Twisted Crab restaurant is located. Detectives saw an individual matching MASON's description enter a Nissan sedan (VA tag TVH8718) in the parking lot of the Chesterfield Towne Center.

5

15.    Detectives followed the Nissan to the 2000 block of Kimrod Road in Richmond, VA, where it parked at/in front of a single-residence brick home with a shed in the back yard. MASON exited the Nissan and entered a shed in the backyard of the house. Detectives approached the shed and two unknown individuals exited. While the shed door was open, detectives saw MASON standing inside with two other individuals. MASON was wearing the same clothing as in the Live videos from that day. MASON was detained and arrested on an outstanding state warrant.

16.    Detectives searched the shed and discovered a black Glock 22 .40 caliber handgun, bearing serial number VSH619, on top of a support wall. The Glock had a weapon-mounted laser on the lower rail with a yellow sticker, an extended magazine, and a machine gun conversion device on the rear plate of the firearm. The Glock matched the depiction of the firearm displayed by MASON that day on Live.

17.    ATF Special Agent Valot, an interstate nexus expert, provided me with a verbal interstate nexus on the Glock, which was determined to have been manufactured outside of the Commonwealth of Virginia and therefore had traveled in interstate commerce prior to its recovery on April 7, 2023.

18.    The Target Device was recovered from MASON's person during his arrest.

**USE OF CELLULAR PHONES FOR CRIMINAL ACTIVITY**

19.    Based on my training and experience, I know that cellular telephones, like the Target Device, are important in a criminal investigation of illegal possession of firearms and/or machine gun conversion devices. In particular, I know that individuals who illegally possess and/or distribute firearms and/or machine gun conversion devices often:

6

a.  use cellular telephones to communicate with weapons suppliers, facilitators, and customers in connection with their ongoing illicit activities, including communication by live conversations, voice messages, text messages, emails, and similar communication methods all conducted via the cellular telephones that often have internet capabilities;

b.  use cellular telephones to maintain records, contact information, notes, ledgers, and other records relating to the transportation, ordering, sale, and distribution of firearms, even though such documents may be in code.  That the aforementioned books, records, notes, ledgers, etc., are commonly maintained where the illegal possessors and/or distributors have ready access to them, including but not limited to their cellular telephones;

c.  use communication applications ("apps") to contact associates, dealers, and/or customers involved in the illegal possession and/or distribution of firearms;

d.  commonly maintain names, addresses and telephone numbers in their cellular telephones for their associates, even if said items may be in code, and that these types of records are sometimes maintained in computers or other electronic data storage devices; and

e.  frequently use their cellular telephones to take, or cause to be taken, photographs and/or videos of themselves, their co-conspirators and associates, their property (including weapons), and/or their product (such as firearms and/or machine gun conversion devices), and usually maintain these photographs and/or videos on their cellular telephone.

7

20.    I know, from training and experience, that individuals involved in the illegal possession and/or distribution of firearms, especially those equipped with an illegal machine gun conversion device, will use cell phones to communicate with potential customers or sellers through various social media platforms such as Facebook, Instagram, and Snapchat and will set up transactions via phone calls and text messages. I know that prohibited individuals who obtain firearms and/or machine gun conversion devices often seek out sellers via cellular phone. I also know that individuals involved in the illegal possession and/or distribution of firearms, like MASON, may display their illegal possession of firearms on the same social media platforms in a boastful manner.

21.    I am also familiar with methods employed by criminals to attempt to thwart any investigation of their criminal activity. These tactics, employed in part to evade law enforcement, include their criminal use of and association with: multiple residences, multiple cellular phones, counter surveillance, smuggling schemes, false or fictitious identities, coded communications and conversations and the use of firearms to ensure facilitation of the illegal activity. I know it is common for individuals who are engaged in the illegal possession and/or distribution of firearms to keep multiple phones or to change phones in order to evade detection by law enforcement.

## TECHNICAL TERMS

22.    Based on my training and experience, I use the following technical terms to convey the following meanings:

    a. **Wireless telephone**: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or

traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.  **Digital camera**:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  **Portable media player**:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other

9

digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. **IP Address**: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer connected to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

e. **Internet**: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

23.   Based on my training, experience, and research, I know the Target Device to have capabilities that allows it to: serve as a wireless telephone, digital camera, portable music/media player, connect to the internet, send and receive emails, and/or send and receive text messages.

In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

24.    Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on electronic devices. This information can sometimes be recovered with forensics tools.

25.    *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of drug trafficking crimes as described herein, but also may provide forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be found on the Target Device because:

      a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

      b.  Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

      c.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

11

    d.  The process of identifying the exact electronically stored information on storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

    e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

26.    *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Target Device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the Target Device to human inspection in order to determine whether it is evidence described by the warrant.

27.    *Manner of execution.* Because this warrant seeks only permission to examine the Target Device that is already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

28.     Based on the foregoing, there is probable cause to believe that MASON committed violations of Title 18 U.S.C § 922(g)(1) (possession of a firearm by a convicted felon) and Title 18 U.S.C § 922(o) (illegal possession of a machine gun).

29.     For the reasons described above, I know that individuals who commit or attempt to commit these kinds of crimes are likely to have evidence of these crimes stored in their cell phones. Therefore, I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Target Device described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

James R. Albright
Special Agent
Bureau of Alcohol, Tobacco, Firearms and
Explosives

Sworn to before me and signed in my presence.

/s/
HON. SUMMER L. SPEIGHT
United States Magistrate Judge
Eastern District of Virginia

Date: 5/23/23

13

## ATTACHMENT A

1.      The property to be searched (the Target Device) is: one iPhone, blue in color, having two rear facing cameras, one rear-facing flash, and one rear-facing microphone held within a multi-colored case with a key-ring and a graphic of a bear (labeled "DARKBEAR").

2.      The Target Device is currently held at the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) Richmond III office, located at 600 East Main Street, Suite 1401, Richmond, Virginia, 23219.

3.      This warrant authorizes the forensic examination of the Target Device for the purpose of identifying the electronically stored information described in Attachment B, which is incorporated by reference.

1

## ATTACHMENT B

30.    All records in the Target Device and/or its previously extracted contents,

described in Attachment A, which is incorporated by reference herein, that relate to violations of

Title 18 U.S.C § 922(g)(1) (possession of a firearm by a convicted felon) and Title 18 U.S.C §

922(o) (illegal possession of a machine gun), including:

    a. Notes, ledgers, messages, and similar records relating to the transportation, ordering, purchasing, and distribution of firearms;

    b. Address books, phone books, applications ("Apps"), and similar records reflecting names, addresses, telephone numbers and other contact or identification data of customers and suppliers of firearms;

    c. Applications and records relating to firearm trafficking proceeds and expenditures of money and wealth, including bank records, deposit receipts, investments and cryptocurrency;

    d. Calendars, applications, and other records of meetings, locations, schedules, and interstate and foreign travel;

    e. Digital photographs, videos, or audio recordings of MASON and/or his confederates, assets, expenditure of proceeds gained through the illegal possession/distribution of firearms, and specific locations documented by the cellular device;

    f. Digital photographs, videos, or audio recordings of MASON and/or his confederates and firearms;

    g. Stored communications, including text messages, MMS messages, voicemails, application communications, and social media communications;

    h. Any subscriber or owner information for the cellular telephones; and

    i. Any cellular telephone records, and telephone books or lists, or receipts relating to the acquisition and purchase of cellular telephones, or minutes purchased or applied to cellular telephones.

2.    As used above, the terms "records" and "information" include all of the foregoing

items of evidence in whatever form and by whatever means they may have been created or

1

stored, including any form of devices or electronic storage (such as flash memory or other media that can store data) and any photographic form.

3.      Evidence of user attribution showing who used or owned the Target Device at the time the things described in this warrant occurred, such as logs, phonebooks, saved usernames and passwords, documents, browsing history and location history

2